———o———

STATE OF MISSOURI, Respondent, *vs.* SAMUEL ORR, Appellant.

1. *Criminal law—Felony—Acquittal of, how shown—Acquittal of co-defendant—Proof of improper, when.*—Proof of acquittal of a felony must be shown by the records and cannot be proved by parol testimony. And the acquittal of a co-defendant cannot be introduced in any shape for the benefit of one charged with commission of a felony

2. *Criminal law—Evidence of guilt—Hypothesis if innocent.*—To establish the guilt of the prisoner the evidence must not only be consistent with a hypothesis of his guilt but inconsistent with that of his innocence.

3. *Evidence—Jury—Falsus in uno, etc.*—When the jury believe that a witness has knowingly testified falsely to any material fact in the trial, they are at liberty to reject his entire testimony.

4. *Instructions—Refusal of proper, when.*—Instructions which are argumentative or misleading, or the substance of which is embodied in others, are properly refused.

*Appeal from Lawrence County Circuit Court.*

*J. W. Patterson*, for Appellant.

*J. L. Smith, Att'y Gen'l* for Respondent, cited: State vs. Phillips, 24 Mo. 475.

Norton, Judge, delivered the opinion of the court.

The defendant, jointly with R. H. Hart, Albert Cox and James Orr, was indicted in the circuit court of Christian county at its October term, 1875, for murder in the first degree, for killing one George W. Davis, in December, 1873. On the petition and affidavit of defendant, based upon the alleged prejudice of the inhabitants of Christian county, a change of venue was awarded to Barry county, from the circuit court of which county a subsequent change of venue was awarded to Lawrence county, on the ground of the alleged prejudice of the judge. At the March term, 1877, of the Lawrence circuit court, defendant was put upon his trial which resulted in a verdict of guilty.

Motions for a new trial and in arrest of judgment having been overruled, the cause is brought hereby appeal.

The counsel for appellant having neither filed an assignment of errors nor brief (although the case was advanced on the docket and set down for hearing at two different times), we have carefully looked through the record to discover whether any error was or was not committed by the trial court.

The evidence as disclosed by the record shows that Davis, the deceased, was, about dark, on the 11th of December, 1873, murdered, by being shot twice in the back of the head, once between the shoulders and once in the small of the back. He was killed in the hog lot a short distance—about fifty yards—from his residence, no person witnessing the tragedy but a little son of deceased, about seven years of age. who testified that about dark, after the deceased and himself had just finished feeding some fattening hogs, two men with long overcoats came up and asked his father if he had any feed to sell, who replied that he had ; that the two men jumped over into the feed lot and were walking through the lot, one by his father's side and one behind him;

that they had gone but a little way when they shot his father several times and ran off towards the Wire road ; that his father was dead when he got to him ; that he saw no horses with the men. It was shown that Davis lived about one-half mile from the road leading from Springfield to Cassville (known and spoken of by the witnesses as the Wire road), and that the distance from Springfield to the residence of deceased was about eighteen miles. It was proven that about eleven o'clock of the day of the murder, Orr, the defendant, and Albert Cox left Springfield on horse-back, " Orr having on a blue great government overcoat," and a black gum overcoat tied to one of the saddles, and took the road known as the Wire road, leading to Cassville. One of them was riding a black or brown horse, and the other a white or gray. Orr and his companion, Cox, were traced by the evidence of a large number of witnesses along this road to within half a mile of Davis' house, at which point they were seen about sundown. A number of the witnesses met them and talked to Orr. To one he said he was going to Arkansas with a drove of stock, either horses or mules or both, that had, a short time before, passed ahead of him. To another he said he was going out hunting, and to another that he was going to a trial.

Both had overcoats on according to the evidence of some, and only one according to the evidence of others. It was also proven by one witness that about twenty minutes before seven o'clock, P. M., of the day of the killing, he met two horsemen on the Wire road riding rapidly toward Springfield about six miles from Davis' house; that he spoke to them without receiving any response; that one of them was riding a white or gray horse; the color of the other he could not tell as it was too dark. It was also shown that Orr and his companion, Cox, had along with them a bottle which contained spirits ; that the bottle was a square bottle, larger at the top than it was at the bottom. The day after the killing several witnesses testified that two or three hundred yards from the scene of the murder, they found a place where two horses had been hitched in the woods, about five feet apart, and at one of the hitching places they found gray or white hairs which had been rubbed off one of the horses ; that they

also found, not far distant, another place where a halt had been made with the horses, and at this latter place they found a square bottle with a few drops of gin in it, answering the description of the bottle which had been seen in the possession of Orr and Cox on the Wire road. It was also shown that Orr returned to the saloon in Springfield, at which he was a bar tender, between nine and eleven o'clock of the night of the murder, and that when he took off his coat he pulled out three pistols. One witness testified that about one week before he heard of the killing of Davis he had a conversation with Orr, who told him that he, Orr, had a good thing to make a raise of four or five hundred dollars, that he wanted to kill a fellow ; that he lived south, and that he wanted witness to go with him, saying they could ride to the place and back in a day. and all he wanted of witness was to hold the horses in the brush while he killed the man. Witness asked him what was the trouble, and the name of the man, some two or three times, when Orr said his name was Davis, and requested him to say nothing about it.

It was proven by several witnesses that previous to the killing Orr had but little money, and afterwards he was seen with considerable sums, and on one occasion flourished a roll of bills as large as a man's wrist, saying that he had blood money.

Defendant, upon being re-arrested, after escaping from the jail, remarked, in answer to the question why he did not get away ? that he would have done so if they had met him at the place they had promised him, and that "by G–d, monied men had hired me to do this, and now that they must be running around at liberty, and I must lie here and suffer for it. I'll blow on the whole G–d d––n thing." No evidence was offered on the part of the defendant to account for his absence from Springfield on the day of the murder, nor tending to show the object of his ride on that day. A negro woman living at the house of deceased, and a daughter of Davis, were introduced by defendant, who testified that the two men at Davis' house on the evening of the murder appeared to be taller men than the defendant. One of them having on a soldier's blue overcoat, and the other a black.

The errors complained of as shown in the record are, first: that the court erred in excluding and admitting evidence; and second: in giving and refusing instructions.

During the progress of the trial, defendant offered to prove by a witness that Hart, who was jointly indicted with defendant, had been tried and acquitted of the charge. The objection to this evidence was properly sustained by the court. If the fact of Hart's acquittal was admissible at all in the case, it could not be established in the way that defendant sought to establish it. The record of the trial and the verdict of judgment of acquittal could alone establish it. But the fact sought to be proved by the rejected evidence was not admissible at all. No rule of law is better settled than that the acquittal of one, jointly charged with another with the commission of a crime, cannot be used in the trial of the other in his favor any more than his conviction could be used on such trial to his prejudice. (State vs. Phillips & Ross, 24 Mo. 475.)

The objection to the introduction of the indictment on the part of the State, for the purpose of showing the time it was found, was properly overruled as there was evidence tending to show that the accused, upon being informed of it, left Springfield; that the fact was communicated to defendant, and that he left Springfield in consequence thereof.

Although objection was made to all the instructions given on behalf of the State, none has been relied on here, and we have been unable to discover error in them.

The first instruction defines, in language repeatedly approved by this court, murder in the first degree.

The second instruction in substance tells the jury that it was not necessary for them to believe that defendant killed deceased with his own hand, if the evidence showed that he was present aiding, counselling, inciting or encouraging some other person in shooting and killing Davis.

The jury are told in the third instruction, that in determining a question of fact from circumstantial evidence alone, the hypothesis of defendant's guilt should flow naturally from the facts proved and be consistent with them; that the evi-

dence should be such as to exclude, to a moral certainty, every supposition but that of defendant's guilt of the offense imputed to him; that it is not only necessary that the facts proved should be consistent with and point to the guilt of defendant, but they should be inconsistent with his innocence.

The fourth instruction defines "moral certainty" to be that degree of certainty which convinces and directs the understanding, and satisfies the reason and judgment of those who are to act conscientiously upon it.

In the fifth and sixth instructions the jury are told, that in determining the question of defendant's guilt or innocence, they should take into consideration the declarations and admissions of defendant given in evidence, as well as his flight from the charge.

In the seventh and eighth they were told that they were the judges of the credibility of the witnesses, and that if they believed any witness had sworn falsely in regard to any material fact they might disregard his evidence entirely.

The ninth contained the usual charge in reference to giving defendant the benefit of a reasonable doubt.

Three instructions were given on behalf of defendant and eight were refused. Two of the three instructions given were but repetitions of what was contained in the second instruction given for the State, while the third declared that " to the jury belonged the duty of weighing the evidence and judging the credibility of the witnesses. The degree of credit due a witness should be determined by his character and conduct, by his manner upon the witness stand, his relation to the controversy, his hopes and fears, his bias or impartiality, the reasonableness or otherwise of his statement, the strength or weakness of his recollection; and if you believe that any witness has knowingly testified falsely to any material fact upon the trial, you are at liberty to reject the whole of such witness' testimony." This instruction stated the law correctly as to the *scienter* of the witness, and may be considered as sufficiently supplementing that stated in instructions seven and eight, *supra*.

Of the eight instructions refused, the first asked the court to declare that the jury should find the defendant not guilty, unless they believed that either he or Cox and Hart jointly committed the murder. This instruction was properly refused ; for under it, had it been given, although the jury might have believed that Cox did the killing and that defendant was present with him aiding and assisting him by his presence, yet they would have been bound to acquit him unless they believed that Hart was also participating with Cox in the commission of the crime. The second instruction was embraced in those which had been previously given. The third asked the court to declare that there was no evidence that Hart and James Orr had hired and procured defendant to kill Davis. The indictment contained no such charge, and it was not necessary to prove it. The fourth and sixth instructions were argumentative and misleading, and the principles announced in them had been previously given by the court in the instructions asked on behalf of the State and the defendant, divested of the argument contained in those refused. The declarations sought of the court in the seventh and eighth instructions were fully covered in the second instruction given for defendant and the sixth given for the State.

We have not been able to discover any such error in the action of the trial court as would warrant a reversal of the judgment.

The killing of Davis was a most foul and wicked murder, and all the circumstances developed in the evidence point unerringly to defendant as the murderer. One week previous to the murder he told the witness Schuler, who was talking of leaving Springfield because he could make nothing, and who was on the most intimate terms with defendant, that he "had a good thing to make a raise of four or five hundred dollars," that he wanted to kill a man who lived South, that the ride could be made from Springfield and back in a day, and that the name of the man to be killed was Davis, and that he wanted witness to go with him. He left Springfield on the morning of the murder, having on a blue government overcoat, riding a black or brown horse, in company with Cox, riding a gray or white horse, one of them having

a square gin bottle. The horses, with Orr as the recognized rider of one of them, were traced, by a number of witnesses, to within a quarter or half mile of Davis' house. A soldier's blue overcoat, according to the evidence of defendant's own witness, was worn by one of the men who murdered Davis.

A gray or white horse was hitched in the woods one-fourth of a mile from the scene of the murder, as shown by the hair found on the tree to which it had been tied, and a gin bottle was found where the two horses had been halted a short distance from where they were hitched, answering the description of the bottle Orr and Cox left Springfield with. After the murder, twenty minutes before seven o'clock, two men were met on the Wire road, six miles nearer Springfield than Davis' house, going towards Springfield, one riding a white and the other a dark horse. Orr appeared in the saloon at Springfield between seven and nine o'clock, according to the evidence of one witness, and between nine and ten o'clock, according to the evidence of the other, of the night of the murder, and took from his person three pistols, remarking to a man whom he had told in the morning that he was going out to a trial, that the trial did not come off; that he came by Newtown and stayed later than he thought. These facts connected with the further facts that the morning after the murder Orr returned to the livery stable keeper a revolver, with one or two barrels discharged, which had been taken from the drawer of the owner the morning before the murder, without his leave or knowledge, fully loaded; the fact of his saying he "had been hired to do this;" that before the murder he had but little money, and afterwards had considerable sums, remarking, on one occasion, that he had "blood money," and the entire failure of defendant to account for his absence from Springfield on that day, and the different stories told by him in regard to the object of his ride, would seem to sustain, fully, the conclusion reached by the jury.

The judgment is affirmed, the other judges concurring.